**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ANTHURIUM SOLUTIONS, INC. | § | |
| | § | |
| v. | § | CASE NO. 2:07-CV-484-DF-CE |
| | § | |
| MEDQUIST, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

### I. Introduction

Anthurium Solutions, Inc. ("Anthurium") filed its complaint against MedQuist, Inc. ("MedQuist"), Arrendale Associates, Inc. ("AAI"), and Spheris, Inc. ("Spheris") (collectively, "defendants") on November 6, 2007, alleging patent infringement. Anthurium accuses the defendants of infringing U.S. Patent No. 7,031,998 ("the '998 patent), which was filed on May 29, 2003, as U.S. Patent Application No. 10/389,116. The '998 patent is a continuation of U.S. Application No. 09/694,884, filed on October 24, 2000, now U.S. Patent Application No. 6,604,124 ("the '124 patent"), which is a continuation of U.S. Patent Application 09/041,839, filed March 12, 1998, now abandoned, which claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application No. 60/040,753, filed March 13, 1997.

### II. Background of the Technology

The asserted patent relates to methods and processes for using hardware and software in a system for automatic electronic document processing. '998 Patent, col. 1 ll. 30-32. Generally, it describes a system for managing workflow using the Internet.

In the preferred embodiment, an authorized user calls to a local computer. '998 Patent, col. 4 ll. 17-29. Using the phone and a fax machine, the authorized user can dictate a memo, fax a document for attachment to the memo, provide processing instructions, and designate

additional users who may access the requested job.  *Id*.  The local computer then forwards the instructions, dictation, and any faxed documents, together as a job packet, to a central server.  *Id*. at col. 3 ll. 36-50, col. 4 ll. 57-62.  Once at the central server, the job packet is processed and assigned to an available scribe, who accesses the job packet and dictates and prepares the document.  *Id*. at col. 6 l. 57-col. 7 l. 11.  The scribe then forwards the completed job back to the central sever for transmission to the authorized user.  *Id*. at col. 7 ll. 11-37.  In identifying the various embodiments and systems, the specification identifies various abstract components of the patented system—HOME, DAD, HIS, MOM, and SUPERMOM.  These terms are disclosed first in the abstract.  The summary contains a brief (and not exclusive) general description of each abstract component.

The system of the present invention consists of
(A) one or more "HOME"s, connected to an internet provider not more than two "hops" away from the internet backbone, where there is a
(1) "DAD" computer and software system for human User interaction to initiate Jobs of Transcription, Translation, Data Entry, and transaction creation and to Input at Job Steps, and to utilize Voice-Mail through realtime voice and tone signal input and
(2) "HIS" computer and software system for keeping the Database used to process Jobs and for keeping the statistical records of jobs for analysis, general ledger, payroll and billing:

(B) one or more "MOM"s where there is a software system server on a computer set on the backbone of the internet that receives Job packets from its HOMEs that includes a Job Record, and directs the Job Packet to its current destination according to its current status, by a combination of placing it in a designated Directory, transferring specified parts to designated HOME's DAD Mail-Boxes, selecting Scribes for transcription, generating Electronic Worker Messages in the form of E-Mail and Voice Mail to specified Users for information or action, updating the status of the Job Record and transferring that updated Record to SUPERMOM, and all the details of job processing steps and logic that has been controlled by Human Supervisors; and

(C) "SUPERMOM" where there is a software system server on a computer set on the backbone of the internet that receives Job Packets from MOMS where portions of the job are spread over two or more MOMS and then SUPERMOM

directs and transfers the job data; receives Job Record updates and maintains a Site for on-line internet job tracking inquiries; selects Scribes for Jobs that are not able to find an available Scribe within their own MOM's HOMES, collects the statistical and financial data from all the HOMEs, and provides the general top level management decision making information for its large international company.

According to the '998 patent, the present invention overcomes various shortcomings of prior art. First, before to the '998 patent, the number of scribes available was limited. *Id*. at col. 3 ll. 37-50. The limits arose from two sources—hard-wire limits to the previous hardware systems and supervisorial limits. *Id*. Regarding the hard-wire limits, some of the prior art systems supported only a limited number of terminals at which a scribe could work. *Id.* As to the supervisorial limits, because human job managers monitored and assigned work, there was a limit to the number of scribes a manager could effectively supervise. *Id.* Second, the '998 patent eliminates the need for on-site transcription through the ability of scribes to connect to the system through telephone or internet connections; this allows for a widely distributed workforce. *Id*. at col. 3 ll. 51-64. Third, the '998 patent can provide information about the scribe, such as productivity, billing information, qualifications, availability in real-time, projected availability, etc. *Id*. at col. 4 ll. 4-16.

The '998 patent includes seventeen claims. Claim 1 is an independent claim, and claims 2 – 17 are dependent claims. Claim 1 is exemplary of the '998 patent as a whole and reads as follows:

1. A system for automatically managing workflow, comprising:
   a local computer that receives an originating job request and job instructions from an authorized user, and generates a job packet containing at least one of a digital file and a reference to the digital file, wherein the digital file represents job input from the authorized user, the job packet further containing a job record that includes a set of computer-readable job processing requirements that are based on an interpretation by the local computer of the job instructions; and

a central computer that receives the job packet from the local computer, reads and analyzes the job processing requirements, updates the job record based on requirements associated with job steps, and automatically forwards job step data to a remote computer associated with a selected scribe, wherein the job step data contains at least one of the digital file and the reference to the digital file. '998 Patent, cl. 1.

Of the various claims of the '998 patent which Anthurium asserts, the parties dispute approximately fourteen terms and phrases.[1]

## III. Discussion

### A. General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

---

[1] Anthurium is presently asserting claims 1 – 5, 8, and 11 – 14 against Defendants; however, Anthurium is not asserting claim 14 against Spheris.

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (emphasis added)(quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e. as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history

is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers

disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. The court now turns to a discussion of the disputed claim terms.

**B. Specific terms in dispute**

Each of the disputed terms and phrases appear in claim 1, as underlined below.

> 1. A system for automatically managing workflow, comprising:
> a <u>local computer</u> that receives an originating <u>job request</u> and <u>job instructions</u> from an authorized user, and generates a <u>job packet</u> containing at least one of a digital file and a reference to the digital file, wherein the digital file represents <u>job input</u> from the authorized user, the job packet further containing a <u>job record</u> that includes a set of computer-readable job processing requirements that are based on an <u>interpretation by the local computer</u> of the job instructions; and
> a <u>central computer</u> that receives the job packet from the local computer, reads and analyzes the job processing requirements, updates the job record based on requirements associated with <u>job steps</u>, and <u>automatically forwards</u> job step data to a <u>remote computer</u> associated with a selected <u>scribe</u>, wherein the <u>job step data</u> contains at least one of the digital file and the reference to the digital file. '998 Patent, cl. 1 (emphasis added).

The Court will address each term/phrase in the order that it appears in Claim 1 of the '998 patent.

**1. "local computer"**

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Local computer** | A computer from which an authorized user can initiate a job, either directly or indirectly | A computer and software system for human user interaction that is physically close to the human user or his principal place of business and includes an information system that stores databases of information used to process jobs, and that is physically remote from the central computer |

This term appears in asserted claim 1 of the '998 patent. The defendants argue that the Court should limit the term in two ways—first, to add a geographic proximity limitation and, second, to add a systems limitation.

Regarding the system limitation issue, the controversy is whether the "local computer" includes the HOME computer, the DAD computer, the HIS computer, or all three. Both parties agree that the "local computer" is at least the HOME computer. The defendants assert that the "local computer" is a HOME computer and software system that actually also includes both the DAD computer and the HIS computer. Their construction requires that the "local computer" (HOME component) include both (1) the computer and software system that intakes dictation (DAD component) and (2) database of information needed to process a job (HIS component). Anthurium argues that the "local computer" does not require *both* the DAD and the HIS.

The claim language supports the defendants' construction. Claim 1 requires the "local computer" to perform three functions: (1) receive an originating job; (2) generate a job packet; and (3) interpret the job instructions. '998 Patent, cl. 1. The specification describes the system at issue in terms of DAD, HIS, and HOME. The DAD component accepts user dictation, and the HIS component contains the data necessary to process the jobs. *See* '998 Patent, col. 1 ll. 42-56, col. 2 ll. 55-62. To perform the recited functions in the claims, the "local computer" contemplates both a HIS component *and* a DAD component.

In addition to the claims, the specification also supports the defendants' construction. In every instance disclosed in the '998 patent, the HOME is specifically identified as consisting of two computer systems, DAD (initiate jobs) and HIS (databases to process jobs). '998 Patent, col. 1 l. 44-col. 5 l. 19. The patentee repeatedly and consistently defines "local computer" to be HOME and to have the ability to both initiate jobs and process them, necessarily involving both the HIS and DAD components as stated in the specification. In support of its argument to the contrary, Anthurium cites a portion of the specification that purportedly contemplates an instance where the HIS is separate from the DAD—"HIS can be either a part of the physical components

of DAD or connected to DAD through a MIS connection." '998 Patent, col. 5 ll. 62-63. This argument is not persuasive. Although the DAD may or may not be physically a part of the HIS, the "local computer," at a minimum, embraces a system that includes both components, the HIS and the DAD. This is true even though they are separated via a MIS connection. Anthurium also points to a citation in which the patent purports not to require a "local computer" with a database. The cited portion states as follows:

> Users of the system interact with the system through POT lines calls to DAD for voice or fax interaction . . . . Jobs are initiated by voice calls to DAD. If a job entails transcription the system may prompt for template to be used. . . . '998 Patent, col. 6 ll. 19-33.

The immediate sentence following the above cited passage, however, supports the defendants. "When a job is ready for Transcription, DAD passes the VOX File along with a skeleton Job record Transaction and the appropriate Template from <u>its storage on HIS</u> to MOM via an FTP." *Id.* at col. 6 ll. 34-37 (emphasis added). As such, the cited specification implies that the "local computer" must have the ability to process the jobs (HIS component), whether or not they are physically a part of the same computer.

The Court now turns to the geographical proximity limitation. The defendants assert that both the claims and specification supports the inclusion of a "physically close" and "physically remote." Looking to the claims, the defendants rely on a claims differentiation argument; claim 1 specifically refers to "local computer," a "central computer," and a "remote computer." '998 Patent, cl. 1. The defendants argue that without a geographic aspect to the construction, such differentiation would be meaningless. The defendants further argue that, if the inventor intended "local computer" to refer to a computer that can be situated anywhere without a geographical limitation, the inventor should have used the term "first computer," as she did in the related '124

patent. Anthurium argues that "local computer" merely describes a user's computer or a "first" computer and nothing more.

The Court agrees with Anthurium as to the geographical proximity issue. The specification does not require "local computer" to be defined using either "physically close" or "physically remote." In fact, unlike the system argument, it is clearer in this instance that a physical proximity limitation would read a preferred embodiment out of the patent. One cited portion of the specification states, "[i]t is a great advantage of the present invention that an Author can create a multi-content file while working from a standard push-button telephone, anywhere in the world." '998 Patent, col. 4 ll. 17-19. Another cited portion states, "[t]he system of the present invention consists of (A) one or more 'HOME's, connected to an Internet provider not more than two 'hops' away from the Internet backbone . . . ." *Id.* at col. 4 ll. 52-56. This passage suggests that the user does not have to be "physically near" the "local computer." Furthermore, the use of "physically near" does not provide any guidance, as such limitations are too relative. Accordingly, the specification contemplates an indirect initiation of job to the "local computer," in addition to a direct initiation.

As such, the Court defines "local computer" as follows: **"a computer system from which an authorized user can initiate a job, either directly or indirectly, that includes an information system that stores databases of information used to process jobs."**

## 2. "job request"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Job request** | Data from an authorized user to a local computer asking for performance of a job | A communication received from a human user asking for performance of the job |

11

Anthurium proposes what it contends is the plain and ordinary meaning of the term.  The defendants seek to limit the term to a "human user asking for performance of the job."  The defendants' construction seeks to improperly limit the term with little to no support from the specification.

The Court defines "job request" as follows:  **"data from an authorized user to a local computer asking for performance of a job."**

### 3. "job instructions"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Job instructions | Data from an authorized user to a local computer concerning performance of a job | A communication providing directions for performing the job |

This term is not found within the '998 patent specifications.  The central issue regarding this term is generally whether the "instructions" are limited to data or communications.  Anthurium asserts that the defendants' proposed use of "communication" implies a single interaction.  The defendants argue that Anthurium's use of "data" is too broad and is unsupported by the intrinsic record.

The specification implicitly describes the type of information which may comprise "job instructions."  In various portions of the specification, the DAD prompts the authorized user for information, such as priority or preview options.  Then, based on a set of pre-stored rules and user information stored in the HIS, the HOME interprets the user's input to produce job requirements that are stored in a Job Record.  Additionally, the specification indicates the potential for multiple interactions by an author and not merely one solitary interaction.  *See id.* at col. 4, ll. 17-29, col. 6 l. 66-col. 7 l. 2, col. 12 ll. 16-38.  As for the preliminary limitation proposed by Anthurium, "from an authorized user to a local computer," the Court finds that such

limiting terminology is not necessary given the context in which it is used within claim 1 of the '998 patent.

In light of the specification as a whole, the Court construes "job instructions" as follows: **"communication(s) providing information for performing the job."**

### 4. "job packet"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Job packet | One or more electronic files associated with a job | An electronic collection of data sufficient to perform a job |

According to the claim language, a "job packet" contains (1) "at least one of a digital file and a reference to the digital file," and (2) a "job record that includes a set of computer-readable job processing requirements that are based on an interpretation by the local computer of the job instructions." '998 Patent, cl. 1. The central issue with respect to this term is whether a "job packet" must contain all the information sufficient to perform a job. In support of its construction, Anthurium cites to various portions of the specification, which seemingly indicate situations where the "job packet" does not contain all data necessary to perform the job. For instance, the specification states, "[w]hen a job is ready for Transcription, DAD passes the VOX File along with a skeleton Job Record Transaction and the appropriate Template . . . If the Job included any file that was to be sent by the Client and was not, MOM notifies the Client by electronic message, and waits until the missing files are supplied before sending the Job to a Scribe." *Id.* at col. 6 l. 34-col. 7 l. 2; *see also id.* at col. 12 ll. 28-38 ("Optionally, the faxed contract would be preserved as an image file, or, if desired, presented to the Scribe as content to be transcribed or processed."). The Court agrees with Anthurium's proposed construction. The defendants rely on a forced reading of claim 1, ignoring a reading which accounts for the

specification.  The patent clearly contemplates that the "job packet" may provide *some* of the data necessary to perform a job and that subsequent information may follow, either to correct previous submissions or additions.

The Court defines "job packet" as follows:  **"one or more electronic files associated with a job."**

### 5. "job input"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Job input** | Data relating to a job from an authorized user | Data received from the human user that is to be transcribed, translated, or entered |

Claim 1 indicates that "job input" is "from the authorized user" and is related to the "job request" and "job instructions."  '998 Patent, cl. 1.  The central issue regarding this term is whether it is proper to limit the methods by which an authorized user may input job data as the defendant asserts.  Plaintiff asserts that nothing in the specification or claims requires that the job input be so limited as the defendants suggest; in fact, it asserts that the invention contemplates that a user may provide a variety of input, "some of which may be data for transcription and/or translation, but some of which may be in the form of instructions and priority details, additional documents and/or multimedia files for attachment to the electronic file, or the designation of additional users who may access the voice file and/or transcription."  Anthurium's Opening Claim Construction Brief at 17 (citing '998 Patent, cl. 5, col. 6 ll. 20-33, col. 8 ll. 57-60, col. 11 ll. 44-50, col. 16 ll. 6-17).

Claim 1 of the '998 patent contemplates a "job packet" containing a "digital file" and a "job record."  The claim also indicates that the "digital file represents job input from the authorized user."  Anthurium's proposed construction fails to distinguish between a "job record"

and "job input;" it is simply too broad, when read in the context of claim 1 as a whole. With the exception of the "human user" limitation, the limitation proposed by the defendant encompasses most of the interactions contemplated by the specification and sufficiently distinguish it from a "job record."

As such, the Court defines "job input" as follows: **"Data received from the authorized user that is to be transcribed, translated, entered, or assembled."**[2]

### 6. "job record"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Job record** | An electronic file associated with a job | An electronic description of a job |

According to the claim language, a "job record includes a set of computer-readable job processing requirements . . . ." '998 Patent, cl. 1. The issue regarding this term is whether a record is a description of a job or, as Anthurium suggests, merely a file that accompanies a job. The defendants cite to a portion of the specification for their proposed construction—"[a] carefully designed Job Transaction record allows the record to support many functions. Billing, payroll, tracking royalties, use rights, . . . ." '998 Patent, col. 19 ll. 33-39. The defendants argue that the intrinsic record does not support Anthurium's construction. Anthurium suggests that, although a "job record" must be associated with a job, it is not a description of a job.

The Court agrees with Anthurium. The specification passages cited by Anthurium teach against a static description of a job. Instead, the numerous uses of the term indicate an "association" with a job. *See* '998 Patent, col. 6 ll. 34-37. Furthermore, the support cited by the defendants does not suggest descriptive aspects of a job, but simply associated records accompanying a job.

---

[2] *See* '998 Patent, col. 4, ll. 26-29.

As such, the Court defines "job record" as follows: **"an electronic file associated with a job."**

### 7. "interpretation by the local computer"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Interpretation by the local computer** | Processing the job instructions to produce a set of computer readable job processing requirements | Logical reasoning about the job instructions performed by the local computer |

The central issue regarding this phrase is whether the Court should limit it to "logical reasoning," as the defendants suggest; indeed at the base of the disagreement is the definition of "interpretation." Claim 1 of the '998 patent indicates that "interpretation by the local computer" forms the basis of the "computer-readable job processing requirements." '998 Patent, cl. 1. The parties agree on the construction of "computer-readable job processing requirements," defining the phrase to mean "requirements for how a job is to be performed that are in a computer-readable form."

The defendants point to both the specification and the prosecution history for support. The only time the specification of the '998 patent mentions "interpretation" occurs in reference to Figures 2 through 60 of the appendix to the '998 patent. The specification discusses a rule-based system for translating user inputs. An example is shown in Figure 19 of the appendix. Additionally, the defendants assert that the prosecution history supports their proposed construction. During prosecution, the Examiner issued an Office Action in which he rejected claims 15-31[3] as being both (1) "not patentable distinct" over the '124 patent, and (2) obvious under 35 U.S.C. § 103 in light U.S. Patent Nos. 5,875,436 ("the Kikinis patent") and 5,828,730 ("the Zebryk patent"). Defs.' Ex. 4 at 253-55. In response to the Office Action, the patentee

---

[3] Claim 15 became Claim 1 in the '998 patent.

16

stated, "Applicant [] respectfully submits that neither Kikinis nor Zebryk discloses, teaches, or suggests job processing requirements that are based on interpretation by the local computer of the job instructions." Defs.' Ex. 4 at 26. In the subsequent Notice of Allowance, the Examiner states, "Kikinis and Zebryk [] does not teach the job includes a record including job processing requirements as interpreted by the local computer. Specifically, that the local computer interprets the job for processing requirements based on the job was not taught being done by the local computer, but by the server computer." Defs.' Ex. 4 at 7. The defendants thus argue that Anthurium's inclusion of "processing" is overly broad and seeks to recapture what the patentee unambiguously surrendered during prosecution. They point to the '124 patent, which indicates that the local computer of that patent "merely 'generates' a job packet." Defs.' Claims Construction Brief at 17. They assert that "interpretation" must mean something more that what was overcome in the prior art, specifically the '124 patent's use of "generate."

The prosecution history, however, does not present a clear disclaimer of claim scope. *See Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd*., 215 F.3d 1281, 1294 (Fed. Cir. 2000). In her response, the patentee did not argue that the "local computer" performs "logical reasoning." In the Notice of Allowance, the Examiner did not elucidate what is meant by "interpretation." In fact, the crux of the allowance was the fact that prior art teaches "job processing requirements" as being done by a "server computer," whereas the '998 patent teaches "job processing requirements" as being done by a "local computer." There is no clear and unambiguous reason to infer that such job processing involves "logical reasoning," as the defendants suggest. Furthermore, the specification supports Anthurium's construction. *See* '998 patent, col. 6 ll. 20-33.

The Court defines "interpretation by the local computer" as follows: **"processing the job instructions to produce a set of computer readable job processing requirements."**

### 8. "central computer"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Central computer** | A computer capable of communicating, either directly or indirectly, with a local computer and a remote computer | A computer and software system server that is centrally located |

The issues surrounding the construction of this term are similar to the above construction of "local computer." Anthurium intends to include both a direct and indirect aspect, while the defendants seek to impose a geographic limitation. The patent again uses abstract terminology to describe various aspects of the invention. Here, both parties agree that MOM refers to the "central computer." As indicated above, the Court agrees with Anthurium's construction.

Claim 1 clearly indicates communication between the central computer and both the local and remote computers. The specification supports a direct or indirect connection with the local and remote computers. *See* '998 Patent, col. 1 ll. 46-59, col. 4 ll. 52-65. Furthermore, the specification does not import a geographic limitation on the term. The defendants again make a claim differentiation argument concerning the use of "local," "central," and "remote" to modify computer. Here, as above, the specification simply does not support such a limitation. The defendants, in making their argument, are improperly interpreting the specification. The specification describes the MOM as a more of a hub or nerve center, as Anthurium argues. *See id.* at col. 4 l. 62-col. 5 l. 6. There is simply no reason to impart an ambiguous geographic limitation upon the term.

The Court defines "central computer" as follows: **"A computer capable of communicating, either directly or indirectly, with a local computer and a remote computer."**

### 9. "job steps"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Job steps** | Events that occur during the performance of a job | The definition of the job in terms of the series of actions to be performed |

The issue regarding this term is whether "steps" should be defined as "series of actions to be performed," as the defendants suggest, or "events that occur," as Anthurium suggests. In support of their construction, the defendants look to both the claims and the prosecution history. Specifically, the defendants look to Claim 14. Claim 14 states, "wherein the central computer generates a set of job steps that define a job based on the job processing requirements, and tracks progress of the job based at least in part on completion of the job steps." '998 Patent, cl. 14. As argued by the defendants, Claim 14 does not add a limitation to "job steps," but "simply restate[s] what 'job steps' are." Defs.' Claim Construction Brief at 27. Regarding the prosecution history, the defendants point to a statement made to the Examiner during the prosecution of the '124 patent. As indicated above, the '124 patent is the parent of the '998 patent and is thus a part of the prosecution history of the '998 patent. In the remarks section, the inventor states, "Kikinis does not teach a central computer that generates a set of job steps that define a job, tracks a current status of the job based on performance of the job steps. This feature of the claimed invention enables a system according to Applicant's claim 12 to determine whether the job steps are being performed in accordance with the job requirements . . . ." Defs.'s

Ex. 5 at 119.[4]  Anthurium argues that the plain and ordinary meaning of the term should control and cites various portions of the specification.  *See* '998 Patent, col. 6 ll. 49-52, 66, col. 7 l. 2, col. 7 l. 37.

Although the prosecution history of a parent is not dispositive, it is considered intrinsic evidence for the purposes of claim construction and should be considered by the Court. Accordingly, the claims, specification, and prosecution history, when read together, indicate that the following construction of "job steps:" **"the series of actions that defines the job."**

### 10.  "automatically forwards"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| **Automatically forwards** | Primarily performed without human intervention | Forwards independent of action by the scribe |

The issue regarding this term generally centers on the construction of "automatically." Anthurium argues for the plain and ordinary meaning, including "primarily without human intervention."  The defendants argue that "automatically," as indicated by the specification and the prosecution history, means "independent of action by the scribe."

Again, the defendants rely upon the prosecution history of the '124 patent.  As indicated above, it is proper intrinsic evidence to consider.  The defendants argue that the patentee's statements to overcome prior art during the prosecution of the '124 patent form the basis for their proposed construction.  In a Preliminary Amendment, dated February 28, 2001, the inventor attempted to distinguish her alleged invention from the Kikinis patent, by stating the following:

> Kikinis does not teach a central computer that <u>automatically selects</u> a scribe from the list of available scribes, and forwards a job request to a scribe computer associated with the selected scribe.  By contrast, Kikinis teaches that the dictation, including instructions is e-mailed to a transcription center.  The center

---

[4] It appears that the applicant was actually referring to pending claim 13.

pages the "next available transcription person, which then can call in or pick up the emailed information <u>if that person elects to accept the task</u>."

The systems and methods of the present invention eliminate the need for the center to page the transcription person by <u>"automatically selecting a selected scribe from a list of available scribes, and forwarding a job request to a scribe computer associated with the selected scribes."</u> Additionally, unlike the system of Kikinis, the claimed invention does not require the center to scroll through a list of scribes to go to "the next available person until the job is accepted." By maintaining a current list of available scribes, <u>the central computer of the claimed system can select a scribe from the current list, and automatically forward the job request to the selected scribe.</u> Defs.' Ex. 5 at 118-19 (citations omitted; emphasis added).

In a subsequent Office Action, the patentee again explained the "automatically forwards" aspect of the invention from the prior art. The patentee stated as follows:

As discussed above, both Kikinis and Zebryk disclose <u>making a file available for the scribe to retrieve, rather than automatically forwarding the file to the scribe</u>. . . . By contrast, because the central computer of the claimed invention <u>automatically forwards</u> the job request to the scribe computer, <u>it is desirable for the central computer to 'know' that the scribe is available</u> so that the job will be performed when it arrives. Defs.' Ex. 5 at 177-78 (emphasis added).

As indicated above, the defendants argue that the patentee disavowed any interpretation of "automatically forwards" that would encompass a system where the job packet was not sent from the central computer to the scribe computer until the scribe contacted the central computer.

Anthurium points to one passage in particular for its argument that the patent envisions a scenario in which, after the scribe has been selected, the central computer places the job in the scribe's directory for the scribe to download. '998 Patent, col. 14 ll. 36-42. Anthurium, however, leaves out the subsequent paragraph.

When the Scribe sits down at their computer to begin a work session, they will dial-in to their local internet provider. They will then go to their Scribe Home form where they will click on the ON-LINE BUTTON. The next screen they view is their Directory. <u>Any jobs in the input directory are to be downloaded by priority indicated.</u> They download all files of a job. '998 Patent, col. 14 ll. 36-42.

As the defendants point out, the passage cited to by Anthurium does not support its argument. In fact, as the subsequent paragraph suggests, the jobs have already been sent to the scribe independent of any actions by the scribe.

Anthurium's argument and proposed construction fail to encompass what the specifications and prosecution history envision. It is clear from the prosecution history that, in order to overcome the Kikinis and Zebryk prior art, the present invention had to "automatically forward," absent any "elect[ing] to accept the task." Defs.' Ex. 5 at 118-19. Additionally, Anthurium's reliance on *CollegeNet* is misplaced. *See CollegeNet Inc. v. ApplyYourself Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005). The defendants do not intend to preclude human intervention; the defendants merely intend to preclude scribe intervention in the "automatically forwards" aspect of the claim. It is of no effect what the scribe does after the "job step data" is "automatically forward[ed]." It is clear that the prior art required scribe intervention to receive the job file; whereas, in this case the patentee intended to claim an invention to overcome such prior art based on the automatic forwarding absent scribe intervention.

As such, the Court defines "automatically forwards" as follows: **"forwards independent of action by the scribe."**[5]

### 11. "remote computer"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Remote computer** | A computer associated with a scribe | A computer and software system for human user interaction that is physically close to the scribe or his principal place of business and includes an information system that stores databases of information used to process jobs, and that is physically remote from the central computer |

---

[5] The scope of the claim language includes the situation in which an e-mail is sent to a scribe's e-mail account, even though the e-mail server is not physically close to the scribe. *See* Tr. of Claim Construction Hearing at 42-44, 87-90.

Much like "local" and "central" computer, the defendants seek to impose the same general limitations upon the present term. The defendants seek to impose both a system and geographic proximity limitation. Also, like above, the patent imposes abstract terminology. Here, the parties generally agree that the "remote computer" refers to the scribe's computer.

As discussed above, the Court is unwilling to impose a geographic proximity limitation on the term. The Court does impose a system limitation for the same reasons discussed above.

As such, the Court defines "remote computer" as follows: **"a computer associated with a scribe that includes an information system that stores databases of information used to process jobs."**

### 12. "scribe"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Scribe | A person who is to perform at least a portion of a job | The person selected by the central computer to perform the job based at least in part on the job packet |

The arguments concerning this term are (1) whether the scribe should be limited to performing the whole job or simply a portion of the job, and (2) whether the job packet forms part of the selection criteria.

The Court agrees with Anthurium regarding the first issue. Anthurium cites to numerous portions of the specification that indicate a scribe may only complete a portion of the job. The key example of this is the patent's use of "proofing scribes." *See* '998 Patent, col. 9 ll. 33-36, col. 3 ll. 51-62, col. 15 ll. 23-42, 46-53, col. 10 ll. 12-37, col. 6 ll. 45-55.

Regarding the second issue, the specification expressly envisions a situation in which scribes are chosen without basis in the job packet. Specifically, the specification indicates,

"[p]roofing Scribes are assigned by HOME personnel to Jobs 'on the fly' <u>at random</u>." '998 Patent, col. 10 ll. 12-13.

As such, the Court construes the term as follows:  **"the person selected by the central computer to perform at least a portion of a job."**

### 13.  "job step data"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Job step data** | Data concerning job steps | Data representing the job steps |

The issue regarding this term is the use of "concerning" versus "representing."  The Court has considered the arguments and adopts the plaintiff's proposed construction.

### 14.  "job"

| Disputed Claim Term | Anthurium's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **Job** | A task to be done | A task of transcription, translation, data entry or transaction creation |

In light of the above construed terms, the Court declines to construe this term and gives the term its plain and ordinary meaning.

## IV.  Conclusion

The court adopts the above definitions for those terms in need of construction.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 9th day of February, 2009.


_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE